647 F.2d 1184
 208 U.S.App.D.C. 55
 LEAD INDUSTRIES ASSOCIATION, INC., Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Bunker Hill Company, Intervenor.
ST. JOE MINERALS CORPORATION, Petitioner,
v.
ENVIRONMENTAL PROTECTION AGENCY, Respondent,
Bunker Hill Company, Intervenor.
 Nos. 78-2201, 78-2220.
 United States Court of Appeals,
District of Columbia Circuit.
 Filed June 27, 1980.
Certiorari Denied Dec. 8, 1980. See 101 S.Ct. 621.
 
 Before WRIGHT, Chief Judge, and ROBINSON and MacKINNON, Circuit Judges.
 Opinion for the court per curiam.
 
 PER CURIAM:
 
 1
 Six months after oral argument was heard in these cases, but before a decision was handed down, LIA filed a motion for leave to file certain documents with the court and, on the basis of these documents, to have the court remand the case to EPA or, alternatively, to hold the case in abeyance pending the outcome of supplemental proceedings before the Agency.[1] At the same time LIA filed a petition with EPA for reconsideration of the lead standards that are the subject of this appeal, alleging that it had uncovered new information that undermined the Agency's analysis. Both LIA's motion in this court and the petition it filed with EPA rested on an affidavit by Anthony J. Yankel, one of three authors of a study entitled "The Silver Valley Lead Study The Relationship Between Childhood Blood Lead Levels and Environmental Exposure."[2] This study is one of several studies referred to in Chapter 12 of the Lead Criteria Document,[3] and it is mentioned in the preamble to the final lead standards as one of three studies EPA found particularly useful in determining the appropriate air lead/blood lead ratio to use in calculating the lead standards. Two points are made in the Yankel affidavit. First, Mr. Yankel indicates that a previously undetected error in the study has led him to conclude that the air lead levels shown in the study are in error by a factor of 25 percent or more. According to Mr. Yankel, if the correct air lead values are used the study would indicate an air lead/blood lead ratio of 1:0.8, rather than the ratio of 1:1.95 EPA calculated.[4] Second, Mr. Yankel indicates his agreement with one of the objections raised by LIA in its briefs in this case.[5] Specifically, Mr. Yankel objects to the fact that EPA used one method for calculating the air lead/blood lead ratio indicated by the data in his study and different methods for calculating the ratios indicated by the data in the other two studies discussed in the preamble to the final regulations.
 
 
 2
 By order dated May 30, 1980 we denied LIA's motion to remand the lead standards to EPA, pointing out that under the statutory scheme LIA must first present a petition for reconsideration to EPA, with judicial review available only after a decision to deny the petition is made by EPA's Administrator.[6] Lead Industries Ass'n, Inc. v. EPA, D.C.Cir. No. 78-2201, Order of May 30, 1980. At the same time we withheld decision on LIA's alternative suggestion that the case be held in abeyance pending the outcome of supplemental proceedings before the Agency, and we directed EPA to inform the court by June 11, 1980 of its decision on LIA's petition for reconsideration. Id. EPA has now notified the court of the Administrator's decision denying LIA's petition. Thus there seems to be no reason for further postponing a ruling on LIA's motion to hold the case in abeyance.
 
 
 3
 Since LIA's motion requested that the case be held in abeyance "pending the outcome of supplemental agency proceedings"[7] which have now been completed, it would seem at first blush that nothing more remains to be decided with regard to LIA's motion. However, it appears that the "supplemental agency proceedings" LIA has in mind is actual reconsideration of the standards by EPA rather than just the Agency's decision on whether to grant its petition for reconsideration.[8] As such, now that EPA has denied its petition we assume that LIA would have us further defer action on this appeal until such time as it is able to obtain judicial review of EPA's decision denying its petition for reconsideration.[9] Thus LIA argued in its response to EPA's opposition to its motion that it should not be required to file a separate petition for review should EPA deny the motion for reconsideration, but instead should be allowed to file a response to such an EPA order.[10]
 
 
 4
 We do not believe that further delay of our review of the lead standard whether to allow a separate review of EPA's denial of LIA's motion for reconsideration, or to review this decision ourselves is appropriate in this case. Nothing in the statute suggests that judicial review of an EPA regulation may not proceed even though there is also pending before the court a petition for review of an EPA decision denying a "new information" petition for reconsideration of the same regulation. To the contrary, there is evidence in the statute of a strong congressional desire that the procedure for establishing air quality standards be completed expeditiously and with considerable finality. The Act prescribes strict deadlines for completion of various steps in promulgation of the standards.[11] Moreover, Section 307(d) (7)(B) of the Act, 42 U.S.C. § 7607(d)(7)(B) (Supp. I 1977), states that even "new information" reconsideration by EPA does not automatically postpone the effectiveness of the rule, and it limits any stay that may be issued by EPA or a court during such reconsideration to a period of no longer than three months. Id.
 
 
 5
 There can be no question that, if our decision in the lead standards case had been handed down before LIA filed its petition for reconsideration with EPA, LIA would have had to bring a separate petition for review of EPA's decision without regard to any challenge to the standards themselves. The fact that LIA's petition and EPA's decision to deny it come at a time when a petition for review of the standards is before the court may, in certain circumstances, justify delaying review of the standards pending a challenge to EPA's decision to deny the petition for reconsideration. In order to conclude that such a delay is justified, however, the court must be convinced that the "new information" which provides the basis for the reconsideration petition raises substantial questions about the validity of the Agency's analysis.
 
 
 6
 We do not believe that this case presents an appropriate instance in which to delay review of the standards. In reaching this conclusion we have found it necessary to examine the merits of LIA's "new information" challenge to the lead standards since this is the only way to determine whether LIA has a substantial case. Of course, this examination is by no means a review of EPA's decision to deny LIA's petition for reconsideration. Rather, our review of the merits is analogous to a court's taking a peek at the merits to assess the likelihood of success in ruling on a motion for a preliminary injunction or a petition for a stay. See Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C.Cir.1958).
 
 
 7
 First, we note that the only issue raised in Mr. Yankel's affidavit that merits consideration is his claim that there is a previously undetected error in his study. His objection to the fact that EPA used different methods in calculating air lead/blood lead ratios from the three studies merely repeats an objection LIA raised in its briefs in the lead standards case[12] which we dealt with in our opinion in the case.[13]
 
 
 8
 Second, even if we were to assume that Mr. Yankel's claim of error is correct, this "new information" would not warrant remand of the lead standards to EPA. As we have previously indicated, that Yankel study is only one of three studies that were discussed in the preamble to the final regulations.[14] In turn, these three studies were only part of the evidence on which EPA relied in selecting an air lead/blood lead ratio of 1:2; the decision was also supported by the conclusions in the Criteria Document (which reviewed a large number of studies including these three studies), as well as other expert testimony in the record.[15] Indeed, in our opinion in the lead standards case we specifically pointed out that "even if we were to disregard (the) calculations (EPA made from the three studies), we would still conclude that the Criteria Document and the expert testimony in the record provide adequate support for the Administrator's choice of an air lead/blood lead ratio of 1:2."[16] It is clear from this that there simply can be no basis for LIA's claim that an alleged error in the Yankel study would justify delaying our review of the lead standards.
 
 
 9
 Third, we also find it significant that there must be considerable doubt both about whether in fact there is an error in the Yankel study and about whether this error has any effect on the ratios indicated by the study. The sole basis of LIA's claim of error is the Yankel affidavit, which merely asserts in conclusory terms that there is a previously undetected error in the study. Neither LIA nor Mr. Yankel has presented any facts, data, or analysis to support this claim of error or information that would have allowed EPA or other interested parties to evaluate the claim of error. Indeed, comments received by EPA on LIA's petition for reconsideration indicate that Mr. Yankel has not even bothered to share his purported new information with his two co-authors of the study, and that his co-authors do not share his misgivings about the study. One co-author, Mr. von Lindern, stated in a letter to EPA:
 
 
 10
 On April 28, 1980, (Mr. Yankel's affidavit is dated April 29, 1980[17]) Mr. Yankel visited me in New Haven, informed me that he was working for the Bunker Hill Co. (a lead/zinc smelting firm (which is an intervenor in the lead standards case)) and requested that I explain the original calculations in our study. After I had done so, he made a vague and non-specific reference to not agreeing with the results of that study. The conversation lasted less than one hour and represents the only professional contact Mr. Yankel and I have had in the last two years.
 
 
 11
 The assertions he makes in the affidavit come as a complete surprise to me. I have reviewed the data and calculations he refers to and find no justification for his claims. It is true, as Mr. Yankel asserts, that a model was constructed to predict air lead levels at locations where no data were available. However, I find the model does not systematically underpredict at areas for which data existed. I find both underpredictions and overpredictions, (as expected with a 'best fit' model) and none of the magnitude of '25 percent or more' as he alleges.
 
 
 12
 I fully recognize Mr. Yankel's right and responsibility to exercise his professional judgement (sic ) as he deems fit and proper. However, I wish to make it absolutely clear that he has not shared the basis for his change of opinion (with), neither does he have the concurrence of, the other researchers in this study. I would rather that he shared the basis for his assertions and calculations with his co-authors before renouncing the work publically (sic ). I object to his use of the term 'error'. I have no idea whether he believes he has found a computational mistake, has changed the data base, or introduced a new method of calculation.[18]
 
 
 13
 Mr. Yankel's other co-author, Dr. Walter, while stating that he has no reason to believe that the study contains the error alleged by Mr. Yankel, went on to calculate the effect of this "error" on the study's estimates of the air lead/blood lead ratios. He found that the study would indicate ratios ranging between 1:1 and 1:1.8, as compared with the range of between 1:1.1 and 1:2.1 indicated in the published study. Dr. Walter concluded: "It is my professional opinion that even if Mr. Yankel's position could be substantiated his conclusions do not provide a basis for altering the EPA standards."[19] Thus it appears that Mr. Yankel's claim of error is anything but proven.[20] This uncertainty about the validity of LIA's "new information" challenge militates against any further delay in handing down our decision on LIA's petition for review of the lead standards.
 
 
 14
 For the reasons indicated above, we conclude that LIA's motion to hold this appeal in abeyance must be denied. LIA is, of course, free to file a petition for review of EPA's decision to deny its petition for reconsideration of the lead standards.*
 
 
 15
 So ordered.
 
 
 
 [1]
 The documents consisted of a copy of the Petition for Reconsideration LIA filed with EPA and a supporting affidavit made on April 29, 1980 by Anthony J. Yankel
 
 
 [2]
 27 J. A. Air Pollut. Cont. Ass'n 763-767 (1977)
 
 
 [3]
 EPA's "Air Quality Criteria for Lead," Chapter 12
 
 
 [4]
 See Lead Industries Ass'n, Inc. v. EPA, 647 F.2d 1130, 1163 n.85 (D.C.Cir.1980)
 
 
 [5]
 See brief for petitioner LIA at 37; reply brief for petitioner LIA at 20-21
 
 
 [6]
 See 42 U.S.C. § 7607(d)(7)(B) (Supp. I 1977)
 
 
 [7]
 Motion of Lead Industries Association, Inc. for Leave to File Annexed Documents and to Remand or to Hold This Appeal in Abeyance (LIA Motion) at 1
 
 
 [8]
 Thus LIA urged the court to remand the case to EPA and direct EPA to hold the reconsideration proceedings specified by 42 U.S.C. § 307(d)(7)(B) (Supp. I 1977) or, alternatively, to "hold the case in abeyance pending action by EPA on LIA's petition, and to keep the record open to receive any record materials generated by those proceedings." LIA Motion, supra note 7, at 5
 
 
 [9]
 It would seem that, ideally, LIA would like us to review EPA's decision without requiring it to bring an independent action for this purpose. See Reply of Lead Industries Association, Inc. to EPA's Response in Opposition to LIA's Motion to File Documents and to Remand or Hold Appeal in Abeyance (LIA Response) at 3-4
 
 
 [10]
 Id
 
 
 [11]
 See 42 U.S.C. §§ 7408, 7409, 7607 (Supp. I 1977); Lead Industries Ass'n, Inc. v. EPA, supra note 4, 647 F.2d at 1136-1137
 
 
 [12]
 See brief for petitioner LIA at 37; reply brief for petitioner LIA at 20-21
 
 
 [13]
 See Lead Industries Ass'n, Inc. v. EPA, supra note 4, 647 F.2d at 1162-1163 & n.85
 
 
 [14]
 See id., 647 F.2d at 1163
 
 
 [15]
 See id
 
 
 [16]
 Id., 647 F.2d at 1163 n.85
 
 
 [17]
 See note 1 supra and note 20 infra. With respect to the von Lindern letter, in denying the motion for reconsideration EPA stated:
 In connection with LIA's petition for reconsideration EPA has received several written comments. Mr. Ian H. von Lindern, a co-author of the Silver Valley study, commented that on April 28, 1980 Mr. Yankel came to see him and stated that he was now working for the Bunker Hill Company (a lead/zinc smelting firm that is a member of LIA and an intervenor in the legal challenge to the lead standard). According to Mr. von Lindern, Mr. Yankel made some vague and non-specific statement that he no longer agreed with the results of the Silver Valley study but did not elaborate. Mr. von Lindern commented that the assertions made in Mr. Yankel's affidavit came as a complete surprise to him and that after reviewing the data and calculations Mr. Yankel refers to he found no justification for such claims and no reason for EPA to reconsider the lead standard.
 EPA's Denial of Petition for Reconsideration or Revision of the Lead Ambient Air Quality Standards (Denial of Petition), -- Fed.Reg. -- (filed June 11, 1980).
 
 
 [18]
 Letter from Ian H. von Lindern to EPA, annexed to Supplemental Response of the Environmental Protection Agency to Motion of LIA to Remand or Hold This Appeal in Abeyance. Mr. von Lindern goes on to note that in the last two years he has conducted further studies related to the Silver Valley study and has found nothing to warrant reconsideration of the latter study. He concluded:
 I believe EPA has made appropriate use of our study in their formulation of a national standard for lead. I believe there is nothing substantive to Mr. Yankel's affidavit and reconsideration (on) the part of EPA is unjustified.
 Id.
 
 
 [19]
 Letter from Stephen D. Walter, Ph.D., attached to Response of Natural Resources Defense Council, Inc. to Petition of Lead Industries Association, Inc. for Reconsideration of Lead Standards
 
 
 [20]
 In its order denying LIA's petition for reconsideration EPA suggested that the comments by Mr. Yankel's co-authors "raise questions about the credibility of Mr. Yankel's statements * * *." Denial of Petition, supra note 17, -- Fed.Reg. -- n.2. EPA may want to consider pursuing this matter further and, if necessary, referring the matter to the Department of Justice for investigation pursuant to 18 U.S.C. §§ 371, 1001 (1976)
 
 
 *
 Before this decision was handed down LIA had filed its petition for review of the Administrator's decision, D.C.Cir. No. 80-1677